IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2015 Session


**BRIAN LE HURST v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2864      Steve R. Dozier, Judge**

_____


**No. M2014-02083-CCA-R3-PC – Filed December 30, 2015**

_____


In 2010, Brian Le Hurst ("the Petitioner") was convicted of first-degree premeditated murder in the death of Eddie Dean Evans and sentenced to life.  The Petitioner subsequently filed a petition for post-conviction relief, which the Davidson County Criminal Court denied following a hearing.  On appeal, the Petitioner contends that the post-conviction court erred in denying relief on his claims of ineffective assistance of counsel and prosecutorial misconduct.  Specifically, he asserts that trial counsel was ineffective for failing to:  (1) complete ballistics testing on the bullet recovered from the victim; (2) object to the prosecutor's closing argument; (3) object to the admission into evidence of a phone call from the victim on the basis of the Confrontation Clause; (4) object to the admission of allegedly irrelevant information from the Petitioner's computer; and (5) object to the testimony of two of the State's witnesses.  Regarding his claim of prosecutorial misconduct, the Petitioner contends that the prosecutor made multiple arguments during closing argument that were not supported by the evidence. Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J. delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Jessica M. Van Dyke, Nashville, Tennessee, for the appellant, Brian Le Hurst.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn Funk, District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual and Procedural Background

On direct appeal, this court summarized the proof at trial, in relevant part, as follows:[1]

Officer Jason Robert Spencer of the Metropolitan Nashville Police Department testified that he was working patrol on June 23, 2008, and he responded to a call concerning a possible dead body at an apartment complex at 6:08 a.m.  He was the first officer on the scene.  When he arrived, he was flagged down by an individual and directed to the back of one of the buildings.  When he walked around to the back, he saw the victim lying on the ground, apparently deceased due to "a devastating gunshot wound to the head."  He testified that he reported a possible homicide to dispatch and secured the area.  While on the stand, he was shown numerous photographs of the crime scene, which he authenticated and which were entered into evidence.

Mr. Brad Corcoran testified that he was recently retired from the Metropolitan Nashville Police Department.  He testified that on June 23, 2008, he was working in the homicide unit, and he had twenty-four years of total law enforcement experience.  He testified that on that date he responded to a crime scene at a specific address on South Oak Drive in Davidson County.  He testified that the crime scene had already been secured when he arrived at the location at approximately 6:55 a.m.  He testified that the victim's vehicle was discovered in the apartment complex's parking lot, and blood stain patterns were also found in that area. He testified that the victim's body was found at the end of a blood trail. The victim was found lying on his back with his arms extended outward. He testified that the victim was wearing a white "Red Robin" pullover shirt that was saturated with blood.  Mr. Corcoran testified that no weapons or shell casings were found on the scene or in the victim's apartment.

Mr. Corcoran testified in detail concerning the investigation that followed.  He testified that he interviewed numerous individuals including a Ms. Jessica Scott, and as a result of these interviews, he began to focus

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal.  See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

his attention on the [Petitioner] (whom he identified in open court). Mr. Corcoran testified that he had considerable difficulty locating the [Petitioner] following the shooting. The [Petitioner] was not at his home or at his place of employment. After speaking with the [Petitioner's] pastor, mother, and aunt, Mr. Corcoran eventually learned that the [Petitioner] was at his mother's house. When he arrived at that location, he found the [Petitioner] sitting on the front porch being treated by emergency service personnel. He testified that he examined the [Petitioner] while he was being treated and determined that the [Petitioner] was not physically injured. Mr. Corcoran testified that the [Petitioner] was eventually taken into custody for an emergency psychological evaluation after emergency service personnel were informed that he may have ingested pills. Afterward, he was processed and booked.

Mr. Corcoran testified that pursuant to search warrants he (1) impounded the [Petitioner's] vehicle, a red Jeep Cherokee, and had it searched; (2) took a deoxyribonucleic acid (DNA) swab from the [Petitioner]; (3) searched the [Petitioner's] home, where three business cards for gun and ammunition-related businesses were discovered, as well as a notebook containing writings signed by "Jess" or other names similar to Jessica Scott; (4) seized and searched the [Petitioner's] computer; and (5) seized and searched the [Petitioner's] cell phone. The witness testified that no firearms or ammunition were ever found during any of the searches.

Mr. Corcoran testified that he attended the victim's autopsy and witnessed a bullet being removed from the victim's neck. He identified this bullet, and it was entered into evidence, along with a "blood standard"—a sample of the victim's blood taken for DNA testing purposes. He also took a swab from a bite mark found on the victim's arm.

Mr. Corcoran testified that he subpoenaed the phone records of Ms. Scott and the [Petitioner], who shared a common cell phone plan. He identified these records, which were entered into evidence. The witness testified that the [Petitioner's] cell phone records revealed that the [Petitioner] called Ms. Scott at 10:03 p.m. on June 22, 2008, and made no further calls until 5:51 a.m. on June 23, 2008. The records also revealed that the [Petitioner] called his mother eight times between 5:52 a.m. and 6:46 a.m. that morning.

On cross-examination, Mr. Corcoran testified that when he initially surveyed the crime scene he concluded, based on the amount of blood he

saw, that a struggle happened in the front parking lot directly in front of the victim's truck. He testified that he followed a blood trail from the front to the back of the victim's building. Mr. Corcoran testified that there were no bullets recovered from the crime scene. He also testified that he had no knowledge concerning the caliber of the bullet that was removed from the victim's body.

Mr. Corcoran testified that as part of his investigation, he contacted all three gun businesses whose names were on the business cards found in the [Petitioner's] apartment. He testified that he did not gain any information relevant to the [Petitioner] from any of those businesses. Mr. Corcoran also testified that nothing of interest was found on the [Petitioner's] cell phone.

Ms. Jessica Scott testified that she was the [Petitioner's] ex-girlfriend and identified him in open court. She testified that she was in a relationship with the [Petitioner] "[o]n and off for about eight years." She testified that in the early part of 2008 she was living with the [Petitioner], and they were engaged. She testified that the [Petitioner] moved out at the end of January or beginning of February and that their engagement was broken off. She testified that they continued to talk and see each other on occasion; "essentially we were still in a relationship but we weren't claiming to be boyfriend and girlfriend at the time." She testified that she and the [Petitioner] were engaged on several occasions during their relationship, and they had been engaged for several months on this particular occasion. She testified that she shared a laptop computer and a cell phone plan with the [Petitioner]. She also testified that the [Petitioner] owned a small black handgun while they were living together.

Ms. Scott testified that after the [Petitioner] moved out, she talked with him often, went over to his place and hung out with him on several occasions, and went out on his boat with him. She also testified that she told the [Petitioner] that she was not "in love" with him anymore. However, she called him on occasion to "help . . . with things around the house" because she "may have needed him."

Ms. Scott testified that she first met the victim in April of 2008, when they "opened the Red Robin in Hendersonville together." She testified that she worked at that location as a bartender and that, at one point, the victim gave his phone number to her. Ms. Scott testified that when she was informed that the victim was being transferred to another

Red Robin location (in Mount Juliet), she called him and invited him to "grab a drink," and they did so. Ms. Scott testified that the following day, she called the [Petitioner] and told him that she had met someone and "wanted to pursue something with him." She testified that the [Petitioner] argued with her and told her that he was not going to lose her.

Ms. Scott testified that over the next several weeks she casually dated the victim. She testified that she continued to talk to the [Petitioner]. She testified that she informed the [Petitioner] when she talked to the victim, and vice versa. She testified that she continued to see the [Petitioner], and at one point she asked him to come over and stain her deck, and he did so.

Ms. Scott testified that sometime later, she went over to the [Petitioner's] house and had sex with him. Afterward, she told the [Petitioner] that it would never happen again. The next day, she met with the victim and pressed him about the status of their relationship. She testified that she and the victim agreed to date each other exclusively. She testified that she stopped inviting the [Petitioner] over to her house at this point.

Ms. Scott testified that she took some steps to keep the [Petitioner] separated from the victim. She testified that she never brought the victim over to her residence in an effort to avoid a possible confrontation. She also parked her car at different locations around the victim's apartment complex in an effort to keep the [Petitioner] from knowing that she was there.

Ms. Scott testified that, these efforts notwithstanding, the [Petitioner] did meet the victim on one occasion. On that day she, her sister, the victim, and their children all went to the zoo. According to Ms. Scott, the [Petitioner] "showed up at some point during the day covered in sweat," introduced himself, shook the victim's hand, and stated that he "just thought [he] would come and join [us] and spend the rest of the day with [us] all." Ms. Scott testified that she was shocked by the [Petitioner's] behavior. She testified that the [Petitioner] explained to her that he was sweaty because "[h]e had been running all over the zoo trying to find us." Eventually, her sister told the [Petitioner] to leave, and he did so.

Ms. Scott testified that following the incident at the zoo she saw the [Petitioner] unexpectedly on several additional occasions. She testified that

a few weeks before the shooting, she had begun spending the night with the victim three or four nights a week, and she would come home to find the [Petitioner] outside her house waiting for her on almost every such occasion. She even discovered the [Petitioner] inside of her residence on some occasions, after he apparently gained access using keys that he had copied during the time when they were dating. Ms. Scott testified that although she had an alarm on the residence, which had been given to her by the [Petitioner], she never changed the alarm code following any of these incidents.

Ms. Scott testified that on June 5, 2008, she returned home after spending the night with the victim to discover messages on her phone informing her that something was wrong with the [Petitioner]. She went to a local hospital and saw the [Petitioner's] mother outside. The [Petitioner] came out and informed her that he had been having thoughts about killing the victim. The [Petitioner] told her that he "need[ed] to go talk to somebody" and that he was seeking help. She testified that this was the first time that she had heard the [Petitioner] express thoughts of violence towards the victim. She testified that she believed that the [Petitioner] made these statements in an attempt to win her back. She testified that she did not tell the victim about the [Petitioner's] statements.

Ms. Scott testified that although she was concerned for and continued to care about the [Petitioner's] well-being, she left. She testified that when she returned to the "crisis center" several hours later to check on him, the [Petitioner] was standing outside. He asked her for a ride, and she took him home. She testified that although she did not initiate any conversations with the [Petitioner] during the following weeks, she would occasionally take his calls.

Ms. Scott testified that on the morning of June 22, 2008, she returned home around 11:30 a.m. after spending the night with the victim. She walked in her door and discovered the [Petitioner] standing at the bottom of her stairs. She testified that the [Petitioner] was very emotional, and he begged her to talk with him and to quit talking to the victim. The witness testified that the [Petitioner] told her that the victim was getting in the way and that if she would just quit talking to the victim, they would be able to "work this out." She testified that she told the [Petitioner] that the victim was not "in the way" and that she was pursuing the victim. She testified that she told the [Petitioner] that she did not have time for further discussion because she had to go to work, and she stepped into the shower

hoping that the [Petitioner] would leave. The [Petitioner] agreed to leave if she would talk with him one more time. She agreed.

Ms. Scott testified that she saw the [Petitioner] again that day sometime after 4:30 p.m. The [Petitioner] arrived at her house bearing "letters that he had written to me" and "a bunch of old pictures of us together." She testified that she allowed the [Petitioner] to show her the pictures and to read to her from these materials. When he was finished, she told him "it doesn't matter" and that she no longer wanted to have anything to do with him. She testified that the [Petitioner] became extremely upset. She testified that she picked up all of the materials that he had brought with him and threw them into the vehicle that he was driving. The [Petitioner] left but returned a short time later to discover her crying. They went back outside again and continued their discussion to the point that it attracted the attention of the neighbors. The [Petitioner] finally left a second time.

Ms. Scott testified that as result of the day's events, she decided to change her alarm code. She called the [Petitioner] later that day and informed him that if he returned to her residence, the police would arrest him and that she would not intervene. She testified that the [Petitioner] asked her if she was telling him that she wanted him completely out of her life, but she told the [Petitioner] that she did not. She told the [Petitioner] that they would still see each other on occasion, but that she was moving on. She testified that the [Petitioner] was very upset.

Ms. Scott testified that on the morning of June 23, 2008, she came into contact with Detective Brad Corcoran of the Metropolitan Nashville Police Department. She testified that she told Detective Corcoran that there had been problems between her and the [Petitioner] and that she and the victim had been dating. During this conversation she was informed that the victim had died. She testified that later that day, she called the [Petitioner], after she was informed that the [Petitioner] had claimed that he would not divulge his location until after he talked to her. During this conversation, the [Petitioner] informed her that he had heard about the victim's death on the radio, and he was afraid that the police were coming to get him. She testified that the [Petitioner] told her that he had not shot the victim. Ms. Scott testified that the [Petitioner] attempted to speak with her several additional times after June 23, 2008.

Ms. Scott testified that during his investigation, Detective Corcoran showed her a notepad. She testified that the letter written inside was

written in the [Petitioner's] handwriting.  At the prosecutor's request, she read the letter aloud to the jury:

> Dean, you have been great, sweet, awesome and I care for you but Brian and I have shared eight years.  I have never seen him like this and I can't take it.  He has reminded me of feelings I didn't know we still—were still there.  Even though I'm not in love with him, I do love him.  I don't know what I believe and I am also scared of getting hurt but even though I don't want him right now, I'm going to try and give him this chance simply because of the love he has for me and the love I had for him in the past.  I don't expect you to wait for me and you will also be special to me but I am going to do this for him.  I hope you understand and know that the only way to give this a fair shot means . . . .

The witness testified that a portion of the paper was torn out, but the letter continued several pages later, stating:  "you and I can't talk anymore.  I am sorry for hurting you and maybe I shouldn't have let things move so fast after just coming out of a relationship.  Please understand and forgive me, Jess."  The witness testified that she did not write that letter and never said anything like that to the [Petitioner].

On cross-examination, the witness testified that she had no memory of ever seeing the letter that she had just read at any point before the start of the investigation.  Ms. Scott testified that she and the [Petitioner] had numerous friends in common and went to church together.  She testified that for eight years, she was a big part of the [Petitioner's] life and the [Petitioner] was a big part of her life.

Ms. Scott testified that the [Petitioner] moved out of their shared residence because she did not want him living there anymore.  She testified that the [Petitioner] wanted to continue their relationship after he moved out, and during this time they saw each other socially with mutual friends and took trips together to a lake.  She also testified that they were still sleeping together during this time period.

Ms. Scott testified that her relationship with the [Petitioner] stopped on May 11, 2008, the day after she went on her first date with the victim.  She testified that she only slept with the [Petitioner] one time after she started dating the victim.  The witness acknowledged that she and the

[Petitioner] attended church together until the time of the shooting. She also acknowledged that she called the [Petitioner] over to her house on several occasions after she started dating the victim to perform chores for her. When asked why she would engage in all of these activities with a man she knew was desperate to win her back, the witness explained her behavior by claiming that the [Petitioner] had admitted to her that he had slept with another girl.

Ms. Scott testified that the [Petitioner] was upset when he learned that she had gone on a date with someone else, and he became more upset as the situation continued. She testified that the [Petitioner's] behavior was strange for him. She testified that the [Petitioner] had been jealous throughout their relationship, but he was acting particularly desperate on the day he met her at the zoo. She testified that the [Petitioner] told her repeatedly that the victim was not the right person for her. Ms. Scott testified that the [Petitioner] informed her that the victim had been married in the past and was cheating on her.

Ms. Scott testified that during her conversations with the [Petitioner] on June 22, 2008, the [Petitioner] was crying and upset. She testified that he was very emotional when he left her house, and he was "acting pretty desperate."

On redirect examination, Ms. Scott testified that the [Petitioner] acted in a jealous manner throughout their entire relationship, and she was not surprised that he behaved in a jealous manner when he found out she was dating the victim. Ms. Scott also testified that the [Petitioner] had admitted to her that he had learned that she was going to be at the zoo on the day that he met her there because he had gone through her cell phone and seen her plans. Ms. Scott testified that on June 22, 2008, when she called the [Petitioner] and told him about changing her alarm code, the [Petitioner] was not crying, but he was angry.

Next, Officer Johnny Lawrence of the Metropolitan Nashville Police Department testified that he worked in the department's identification division and that he was called to a crime scene at 6:15 a.m. on June 23, 2008. He testified that he photographed and diagramed the crime scene, and he authenticated numerous pictures and diagrams which were entered into evidence. He testified that during his investigation, he discovered blood on several vehicles located in the parking lot of the apartment complex and a trail of blood leading to where the victim's body was

discovered. Officer Lawrence also testified that he searched the [Petitioner's] vehicle, a red 1999 Jeep Cherokee, during his investigation and found a picture depicting the [Petitioner] and Ms. Scott posing together as a couple in the glove compartment, which was entered into evidence.

On cross-examination, Officer Lawrence testified that the blood trail he found at the crime scene started at one area of the parking lot and ran between two vehicles and into a grassy area before leading to the back of the apartment building. He testified that the blood trail was sporadic, as if "someone was walking here, walking there, moving here, and going up to the edge of the patios in the back" of the apartment building. Officer Lawrence testified that there was a blood "swipe" discovered on the victim's truck that could have been caused by a hand, clothes, or hair with blood on it sweeping across the object. Officer Lawrence testified that he did not discover any blood when he visually inspected the [Petitioner's] jeep, and he did not perform any chemical tests to determine if blood was present.

Officer Tim Matthews of the Metropolitan Nashville Police Department testified that he helped process the crime scene by taking photographs of the victim's body. He authenticated these photographs and some of them were entered into evidence. He also testified that he took a DNA swab of a bite mark found on the victim's right forearm. On cross-examination, Officer Matthews testified that no bullets were recovered from the crime scene. He testified that although he saw markings that he initially believed were bullet holes in the side of a nearby apartment building, he later determined that these markings were not caused by bullets because they were not penetrating holes. He also testified that he performed a chemical test for blood on the [Petitioner's] jeep and determined that none was present.

. . .

Mr. Craig Calvert, an assistant general manager at the Mount Juliet Red Robin restaurant, testified that the victim was a kitchen manager for Red Robin restaurants. He testified that on June 23, 2008, both he and the victim were scheduled to work at 5:00 a.m. Shortly after midnight that day, he called the victim to let him know he would not be coming in to work later that morning because his father was in the hospital. He testified that at 4:30 a.m. on that day, he called the victim and spoke with him, informing him that his father had just passed away and that he definitely would not be

- 10 -

in to work. He testified that the victim was getting ready for work when he spoke with him the second time.

Ms. Shawn Snowdon, who lived at an address on North Oaks Drive at the same apartment complex as the victim, testified that she woke up from a nightmare at 4:30 a.m. on June 23, 2008, and went out to her balcony to do some writing. She testified that shortly before 5:00 a.m., she heard an argument in the parking lot between her building and the next one, which were separated by a forest. Shortly afterward, she "heard one or two pop noises" which she initially believed were fireworks. However, she made a note on her paper stating "one or two shots 5:03." She testified that she was certain of the time because she read it off of a large digital "Budweiser" clock that was set to her cell phone time. She testified that she heard two or three shots "a minute or two later," and also wrote those down. She testified that she heard another three to four shots at 5:07 a.m., and after that she heard nothing but silence. She testified that she heard six to nine shots in all.

Ms. Snowdon testified that the gunshots and the two arguing voices came from the other side of the forest. She testified that she had written all of this information down because she "just had this gut feeling like that it might be important." She also testified that she heard a "pa-choon" sound that morning, like a ricochette hitting the bark of one of the trees.

On cross-examination, Ms. Snowdon testified that her balcony was facing the building where the shooting occurred. She testified that she could tell where the argument was occurring from because the voices were facing her. She testified that she was not sure whether the voices at issue were male or female. She estimated that the argument that she heard lasted about thirty seconds. She testified that she was not sure that the popping noises she heard were gunshots when she first heard them. She testified that she did not initially call the police because she "was in denial." She testified that she did not see anyone run away or any car speed off that morning. Before leaving the stand, the witness indicated on the aerial map of the apartment complex where her unit was located as well as the location of the nearby forest.

Dr. Tom Deering, an expert in forensic pathology, testified that he had reviewed a medical report prepared by Dr. Stacy Turner, who had performed an autopsy on the victim but had since moved out of state. Dr. Deering testified that the report described the victim as having four gunshot

wounds to the head and neck. The report also described an apparent bite mark on the victim's forearm and some small abrasions on the victim's skin. The witness identified these wounds on various photographs that were shown to him on the stand, and these photographs were entered into evidence. Dr. Deering testified that the abrasions on the victim's knees appeared to be fresh because the skin had not yet started to seal over. He opined that the bite mark was probably inflicted while the victim was still alive based on the nature of the bruise pattern that was evident in the photographs.

Dr. Deering testified that the victim had one gunshot wound to the left back of his head, which traveled through his brain and exited his cheek. He testified that in his opinion this was the wound that "puts [the victim] to the ground" and that after it was inflicted the victim would not have been conscious. In his expert opinion, Dr. Deering testified this wound was inflicted in the location where the victim's body was discovered, and it would have been fatal by itself.

Dr. Deering testified that the victim had an additional gunshot wound that entered the back left side of his neck and exited the right side of his neck. The witness testified that this wound had "stipple marks" or "gunpowder tattooing" around the entrance, which indicated that the wound had been inflicted by a gun that was somewhere between six inches and two feet away from the victim's body when it was fired. He opined that this wound may have been inflicted in the parking lot and would have been painful but not fatal by itself.

Dr. Deering testified that the victim had a third gunshot wound to the right side of his jaw, with the bullet ultimately lodging in the victim's neck. Dr. Deering testified that this wound had both gunpowder tattooing and soot around the entrance, meaning that it had been inflicted from a distance of less than six inches, and in the witness's expert opinion, the barrel of the gun was probably touching the victim's skin. Dr. Deering further testified that this wound would have caused an extensive amount of blood to come out of the victim's mouth, and it was the only wound that could have caused the blood that was found on the victim's shirt. Dr. Deering opined based on the blood splatter found on the victim's body that he was standing upright when he was hit by this bullet. After reviewing photographs of the crime scene, Dr. Deering testified that, in his opinion, the bleeding caused by this wound created the blood trail leading from the front of the victim's apartment building to the rear. He opined that this wound was inflicted in

- 12 -

the front of the building in the parking lot and that it could potentially have been fatal standing alone.

Dr. Deering testified that the victim's final gunshot wound was a grazing wound to the right side of the victim's neck. The lack of stippling on this wound indicated that it had been inflicted from a distance of more than two feet. He also testified that this wound would not have been fatal, and it would have been possible for the victim to have been hit by this bullet and still remain mobile. He opined that it could have been inflicted in the parking lot or anywhere along the blood trail.

The witness identified each of these four wounds on numerous photographs that were provided to him, which were entered into evidence. In conclusion, Dr. Deering testified that in his expert opinion, the victim died as a result of multiple gunshot wounds to the head and neck and that his death was a homicide.

On cross-examination, Dr. Deering testified that the bullet trajectory analysis that he performed when he was examining the victim's body would not allow him to determine the position of the shooter vis-a-vis the victim, although he could determine how far the victim had been from the gun when it was fired with respect to some of the wounds. Dr. Deering testified that gunshot residue tests had been performed on the victim's hands, and the swabs had been turned over to the police department. On re-direct examination, Dr. Deering testified that any person standing near where a gun had been fired could have gunshot residue on his skin. He testified that it would not have been unusual for the victim to have had gunshot residue on him because he was shot at close range.

. . .

Mr. Carter Wamp, the property manager of the victim's apartment complex, testified that on June 4, 2008, he received a call from a resident and went to the parking lot area between buildings twelve and fifteen in his complex, where he saw a red Jeep Cherokee parked. He approached the occupant and asked him why he was there, explaining that his presence there for an extended period of time had made one of the residents uncomfortable. Mr. Wamp testified that the individual inside the jeep informed him that he was there to meet a contractor to perform some work on some flooring. He testified that the individual's demeanor was friendly and calm during this conversation. Mr. Wamp testified that he left and

- 13 -

called his maintenance supervisor, who informed him that no flooring work was being done at the complex that day. Mr. Wamp testified that he returned and informed the individual in the jeep that he was mistaken concerning the location of his supposed meeting and instructed him to leave. Mr. Wamp testified that the individual appeared briefly startled at his return, and he moved a small bag from his lap to the side. Mr. Wamp identified the [Petitioner] as the individual to whom he had spoken that day. Mr. Wamp testified that the victim approached him the following day, and after conversing with him, Mr. Wamp informed the complex's [courtesy] patrol officers to be on the lookout for the [Petitioner] and his vehicle.

Mr. Joseph Harris, one of the [Petitioner's] friends, testified that he worked with the [Petitioner] at a pest control company. He testified that the [Petitioner] owned a gun. He testified that the [Petitioner] was unhappy about his breakup with Ms. Scott and wanted to be reunited with her. He testified that sometime after the breakup the [Petitioner] told him that he had slept with another girl. In addition, during a joint trip to Clarksville that occurred a month or two prior to the killing, the [Petitioner] told him that he had been having dreams concerning homicidal thoughts toward the victim.

Mr. Harris testified that on June 23, 2008, the [Petitioner] was not at work when he arrived. Sometime during the afternoon, the police came to the office looking for him. Mr. Harris testified that he went to the parking garage, called the [Petitioner], and asked him what was going on. The [Petitioner] replied that he did not know. Afterward, the police told Mr. Harris not to call the [Petitioner], but he informed them that he had already done so. He testified that after additional conversations with the police he called the [Petitioner] again and asked the [Petitioner] to turn himself in. He said the [Petitioner] told him that Ms. Scott was going to hate him for the rest of his life.

Mr. Harris testified that he visited the [Petitioner] in jail sometime later and had a conversation with him there. Over the [Petitioner's] objection, Mr. Harris testified that during this conversation the [Petitioner] told him that he believed that Mr. Harris might believe that he and Mr. Harris's wife were having an affair and that Mr. Harris was mad at him as a result. Mr. Harris testified that he informed the [Petitioner] that he did not believe any affair had occurred. He testified that he informed the [Petitioner] that he was mad because he was a father, the victim had been a father, and he did not believe that the [Petitioner] had thought through his

choices. The [Petitioner] responded that he felt regret and claimed to have been "driving around like in a dream state" following the killing. Mr. Harris clarified that the [Petitioner] acknowledged killing the victim during this conversation. Mr. Harris also testified that the [Petitioner] had claimed that he had not "run to Mexico or something" following the killing because he needed to collect his wages from work and "didn't think the police would, you know, come get him that soon . . . ." On cross-examination, Mr. Harris testified that the trip to Clarksville during which the [Petitioner] had discussed dreaming of homicidal thoughts toward the victim occurred prior to the [Petitioner's] hospitalization. Mr. Harris also testified that the [Petitioner] owned a gun because he had been "car jacked" in downtown Nashville over the past summer. Finally, Mr. Harris testified that during his jailhouse conversation with the [Petitioner], the [Petitioner] had claimed that he was going to trial over the charges and that Mr. Harris "would be surprised when [he] learned the circumstances of the shooting." On redirect examination, Mr. Harris testified that the [Petitioner] carried his gun with him "[p]retty much all the time."

Ms. Julia Neilan, a crisis counselor at Mental Health Cooperative, testified that she performed an assessment of the [Petitioner] on June 5, 2008. She testified that following this assessment she contacted the victim and warned him for his safety. On cross-examination, Ms. Neilan testified that the [Petitioner] was not in police custody and voluntarily sought her help on June 5.

Ms. Angie Alexander, a friend of the [Petitioner] since childhood, testified that the [Petitioner] spoke of Ms. Scott frequently following their break-up and that he often missed work. She testified that the [Petitioner] also spoke of the victim and knew where the victim worked. Ms. Alexander testified that shortly before his trip to the hospital, the [Petitioner] told her that he could kill the victim. She testified that upon hearing this she advised the [Petitioner] to go to the hospital. On cross-examination, Ms. Alexander testified that the [Petitioner] lost a considerable amount of weight and sleep following the break-up. She also testified that the [Petitioner] never again stated an intention to hurt the victim after he went to the hospital.

Finally, Detective Chad Gish of the Metropolitan Nashville Police Department, an expert in digital forensics, testified that he performed a forensic analysis on a seized computer and had prepared a report detailing his findings. This report was entered into evidence. Detective Gish

- 15 -

testified that during his analysis he determined that the computer at issue was registered to the [Petitioner] and was running three minutes fast but otherwise accurately recording the date and time. He testified that the computer listed three users, "Brian," "Jessica," and "Jordan." He testified that he found nothing relevant to his investigation in the "Jordan" account. He testified that he was able to recover some internet search history for the "Jessica" account but also discovered nothing relevant to the investigation. He testified that this account was last used on May 11, 2008, at 4:20 p.m. He testified that he discovered a "smart keystroke reporter" in the computer's recycle bin, which was a shortcut to a program that logged all of the keystrokes made on computer.

Detective Gish testified that he was able to recover internet search history with respect to the "Brian" account, and he discovered several things of potential relevance to the case. On May 12, 2008, the user searched the term "Red Robin." On May 14, 2008, the user searched the terms "Red Robin Smyrna," "Red Robin management policies" and "Red Robin dating policies." On May 16, 2008, the user used whitepages.com to search for Dean Evans. On May 17, 2008, the user queried "guns for sale" on Craigslist and Google. The user also browsed several pages on a website called "Gunsofamerica" dealing with Taurus pistol revolvers. On June 4, 2008, the user performed a Google search of "poisons." Fifty seconds later, the user researched the same term on Wikipedia, as well as the term "cyanide poisoning." A short time later, the user performed a Google search of the terms "rattlesnakes for sale in Tennessee." Detective Gish also determined that the user searched on Yahoo: "What would happen if you injected air into a person's veins," and the user entered a similar query on Google a short time later. A few minutes later, the user searched for Dean Evans of Nashville, Tennessee on a site called "peoplelookup.com." The user then "mapquested" directions to a specific address in Mount Juliet. Then the user went to Google and searched the phrase "live your life stealing all of my sunshine."

Over the [Petitioner's] objection, Detective Gish testified that on June 20, 2008, the user searched several phrases on Google, including "Missy needs," "Missy does," "Missy hates," "Missy eats," "Melissa dies," "Brian needs," "Brian does," and "Brian hates." Detective Gish testified that on June 22, 2008, the user "mapquested" directions from Brentwood, Tennessee, to Mount Juliet, Tennessee. Detective Gish testified that this search was deleted sometime later.

On cross-examination, Detective Gish testified that the internet history that he had discussed in his direct examination was only a small portion of the total internet history found on the computer. Detective Gish also testified that there was no guarantee that the [Petitioner] was the individual using the "Brian" user account. Detective Gish testified that the key logger had been sent to the recycle bin on March 21, 2007, but would still have been active on the computer because the recycle bin was never emptied.

Following this testimony, the State rested, and the [Petitioner] moved for a judgment of acquittal, which was denied. The [Petitioner] then took the stand in his own defense. The [Petitioner] testified that he was thirty years old and had been dating Ms. Jessica Scott since he was twenty. He testified that he was attracted to Ms. Scott immediately and fell in love with her quickly. He testified that their two families were intertwined, that they spent holidays together, and that they had many friends in common.

The [Petitioner] testified that he and Ms. Scott became engaged at one point but that their engagement came to an end because they "were young." He testified that they continued to see each other after the engagement ended, and the majority of the time their relationship was exclusive. He testified that they got engaged again in late June of 2006. He testified that Ms. Scott built a house while they were dating. He moved in with her when it was finished. The [Petitioner] testified that he was happy while he was living with Ms. Scott, he wanted to have children, and he was ready to move toward marriage. He testified that he felt secure and happy in his relationship with Ms. Scott.

The [Petitioner] testified that he moved out of the residence that he had shared with Ms. Scott in January of 2008. He testified that their engagement ended, but they both agreed to continue dating and to be exclusive with each other. He testified that although they were no longer engaged, his relationship with Ms. Scott remained "basically the same" except for the fact that they no longer lived together. He testified that he spent the night with Ms. Scott on a regular basis, and they still slept together two or three times per week. He testified that he continued to share financial responsibility for the house and related expenses with Ms. Scott, and he continued to store a considerable amount of his personal belongings there. The [Petitioner] testified that moving out of the residence took a personal toll on him but that he set up goals for himself and tried to move the relationship back in a positive direction.

- 17 -

The [Petitioner] testified that on May 10, 2008, he went over to Ms. Scott's house. She informed him that she was on her way to work but instructed him to go ahead and "weed eat" her yard anyway. Ms. Scott briefly mentioned the idea of selling her house and moving to Gallatin. The [Petitioner] testified that in response he asked Ms. Scott if they needed to talk, and she informed him that they did. The [Petitioner] testified that "one of the first things she said was, you know, I think we ought to be able to see other people." The [Petitioner] asked Ms. Scott if she wanted to end the relationship, and Ms. Scott told him that she did not. The [Petitioner] testified that he started to panic. He asked Ms. Scott "who is he?" In response, Ms. Scott laughed and emphatically denied that she wanted to see anyone else. He testified that Ms. Scott did eventually admit that she had been out for drinks with a friend from work the night before, but she told him that there was no romantic interest or attraction there and that there had been no physical contact of any kind.

The [Petitioner] testified that Ms. Scott informed him that she was going to have drinks one more time with "this friend of hers" but claimed that it was nothing romantic. At the end of the conversation, the two of them agreed to continue seeing each other, and they saw each other the next day. The [Petitioner] testified that after May 10, he and Ms. Scott still saw each [other] just as frequently, and he would often go over to her house to cut her grass or wash her car or change the oil. The [Petitioner] testified that Ms. Scott really liked receiving attention from him, and she enjoyed it when he would do things like give her a card or flowers.

The [Petitioner] testified that he eventually asked Ms. Scott if he could meet her "friend," but she told him "no, Dean wouldn't like that," which was how he first learned the victim's name. The [Petitioner] testified that Ms. Scott continued to deny that anything romantic or intimate was happening with the victim. However, the [Petitioner] began to get suspicious, and over time he became "100 percent totally consumed with who [Ms. Scott] was seeing" and whether she was being honest with him. He testified that he started losing his appetite, and he was not sleeping. He testified that he subsisted primarily on water, and he lost forty pounds over the next three weeks. He testified that everyone around him knew that he was not doing well.

The [Petitioner] testified that he began doing research on the victim right from the beginning. He testified that he was able to discover the

victim's phone number because he and Ms. Scott shared a wireless plan, and he discovered the victim's full name and the company he worked for through a simple computer search using his phone number. He testified that when he discovered that the victim was Ms. Scott's supervisor at work, he researched company policies on dating in an attempt to break them up. He testified that when he informed Ms. Scott of what he was doing, she became upset with him. However, she told him that she was not going to see the victim anymore.

The [Petitioner] testified that he first discovered that Ms. Scott was seeing the victim romantically just before Memorial Day weekend, when he went by her house while she was supposed to be at work. He went into the house to do some laundry and logged onto their computer, only to discover MapQuest directions to the Nashville zoo in an open Internet browser. He testified that he went to the zoo to see if she was telling him the truth, hoping that Ms. Scott would just be there with her sister. However, he testified that he discovered Ms. Scott sitting in an amphitheater with a man he had never seen before.

The [Petitioner] testified that his heart sank, and he started having major anxiety. He testified that he waited for the show that they were watching to finish, and while doing so, he saw the man touch Ms. Scott several times in an intimate and caring manner. The [Petitioner] testified that the two saw him after they left the amphitheater. The [Petitioner] testified that he did not want to cause "a situation" in front of the children and others in their group, so he said something to them about being sorry for being late to "family day at the zoo." The [Petitioner] testified that he hoped that the adults in the group would just "run with it," but Jessica's sister "blew up" at him instead. He testified that afterward, Ms. Scott came up to him and said that she was very embarrassed by the situation. She informed him that she was going to cancel their plans for Memorial Day weekend if he did not leave, so he left and waited in the zoo's parking lot. As he waited, he saw Ms. Scott and the victim leave the zoo hand-in-hand. As Ms. Scott got into her car, he saw them hug and kiss, and "it just all came crashing down" because "I knew she had been lying."

The [Petitioner] testified that he was devastated. He testified that he was "consumed with anger and rage and jealousy." He testified that he approached the victim in the parking lot as the victim was returning to his own vehicle and informed him that Ms. Scott was in a committed relationship. He testified that the victim told him that it was none of his

- 19 -

business. He testified that he had dinner with Ms. Scott later that evening and they watched a video together at her house. He testified that he and Ms. Scott went on to spend Memorial Day weekend together with friends at a lake as planned.

The [Petitioner] testified that over the next several days Ms. Scott admitted that she was dating the victim. The [Petitioner] testified that he became confused by the way Ms. Scott was treating him. They began to argue about the victim all the time. The [Petitioner] testified that after the first week in June, Ms. Scott and the victim got more serious and that she began staying over at the victim's house "pretty regularly." The [Petitioner] testified that many nights Ms. Scott would stay at the victim's house until 1:00 to 3:00 a.m., then returned home to her house where he would be waiting for her. She would then climb into bed and give him "a warm welcome."

The [Petitioner] testified that he continued to have difficulty sleeping, and when he did sleep, he would have dreams involving violence towards the victim. The [Petitioner] testified that he became suicidal, and he began researching ways to kill himself on the Internet. He also began researching gun purchases.

The [Petitioner] testified that on one occasion he went to the victim's place of employment in Mount Juliet. He went there intending to inform the victim that he was still seeing Ms. Scott because he had begun to suspect that Ms. Scott might be lying to the victim about their relationship. He testified that when he arrived, the victim came out of the restaurant with a "young attractive blonde headed girl" on his arm. The [Petitioner] testified that he saw the victim walk this girl to her car and give her a kiss. The [Petitioner] testified that he did not inform Ms. Scott of what he had seen because he did not believe that she would believe him. He decided he needed to gather proof.

The [Petitioner] testified that on June 5, 2008, he went over to the victim's apartment complex because he wanted to confront the victim and "just have it out with him, you know, and just confront this issue." The [Petitioner] testified that he sat in his Jeep in front of the victim's apartment complex and waited. He testified that he had homicidal thoughts. He testified that he was eventually approached by someone in a golf cart who asked him why he was there, and he told this individual a lie. He testified that the individual later asked him to leave, and he did so. He testified that

- 20 -

afterward, he went to Centennial Hospital and checked himself in because he was having homicidal and suicidal thoughts. He testified that he was later released into the custody of the mental health cooperative, and he was ultimately taken to his mother's house by Ms. Scott.

The [Petitioner] testified that Ms. Scott began spending more time with the victim, although she was still willing to spend time with him as well. He testified that he and Ms. Scott were still sleeping together. The [Petitioner] testified that eventually, Ms. Scott told him that she and the victim had decided to be exclusive, and they agreed to be just friends. During this same conversation, the [Petitioner] mentioned the names of a couple of attractive female friends to Ms. Scott to gauge her reaction. The [Petitioner] testified that Ms. Scott "acted jealous when I mentioned to them." However, at the end of the conversation, they agreed to see other people and to no longer see each other.

The [Petitioner] testified that after this conversation he "hooked up with a friend" named Missy. The [Petitioner] testified that he immediately regretted doing so, and he felt as though he was cheating on Ms. Scott. The [Petitioner] testified that when he informed Ms. Scott of what had transpired, she was very upset.

The [Petitioner] testified that on the day before the shooting he went over to Ms. Scott's house because they had agreed to go to church together. He testified that Ms. Scott was not there when he arrived, so he waited. When she finally returned, they had an emotional conversation, during which Ms. Scott was crying and kissing him. He testified that during their conversation Ms. Scott told him that she could not stop seeing the victim because the victim had been "nothing but nice" to her, and she did not know how she could possibly explain to the victim why she wanted to be with the [Petitioner]. The [Petitioner] testified that he finally left when Ms. Scott told him that she had to go work. He testified that when he returned home, he wrote out a draft letter to demonstrate to Ms. Scott how she could let the victim down without "seeming like a jerk."

The [Petitioner] testified that he saw Ms. Scott later that evening and that they discussed their relationship further. At one point, Ms. Scott became angry and asked him to leave. The [Petitioner] decided that he needed proof that the victim was "not the person that she thought that he was." The [Petitioner] testified that he drove his mother's car to the victim's residence in the early morning hours of June 23, 2008. The

[Petitioner] testified that shortly after he arrived, he saw the victim leave his apartment in the company of the same woman that he had seen with him previously. The [Petitioner] testified that he saw the two of them hugging and kissing. The [Petitioner] testified that the victim saw him at one point, but he waited until the girl left before confronting him.

The [Petitioner] testified that he had gotten out of his car because he had hoped to discover some evidence of the woman's identity in the victim's vehicle. The victim approached him while he was in the parking lot near the victim's truck. The [Petitioner] testified that the victim asked him why he was there, and he responded by asking the [victim] why the blonde girl had been there when the victim was supposed to be in a committed relationship with Ms. Scott. The victim informed him that Ms. Scott would not believe him about the blonde girl because he had been "doing crazy things" recently. In response, the [Petitioner] pretended to have taken an incriminating cell phone video of the encounter. The [Petitioner] testified that he was manipulating his cell phone when the victim lunged at him to take the phone and wrapped him in a chokehold.

The [Petitioner] testified that he attempted to hide his cell phone by placing it in the same pocket where he happened to be carrying his gun. The [Petitioner] testified that during their struggle, the victim reached into his pocket to retrieve the cell phone, but the victim pulled his gun out instead. The [Petitioner] testified that the gun went off right next to his head. He testified that the gun also went off a second time during their struggle. He testified that he felt something wet on his back, lost his balance, and almost fell on his face.

The [Petitioner] testified that he turned around and discovered the victim pointing the gun at him. The [Petitioner] testified that he begged the victim not to shoot him, but the victim responded "You f'ing killed me." The [Petitioner] testified that he ran away, and the victim followed him. The [Petitioner] testified that he hid behind a porch at the back of the apartment building as the victim chased him and then lunged out at the victim as he passed. The [Petitioner] testified that the two of them wrestled around in a circle for control of the gun. Finally, he bit the victim, and the victim let go of the gun. The [Petitioner] testified that he told the victim to let go of him, but the victim refused. The [Petitioner] testified that he fired two or three shots and then ran away without checking on the victim. The [Petitioner] testified that he never intended to kill the victim because he knew that there was no way he could do so and still get Ms. Scott back.

The [Petitioner] testified that he was covered in blood. The [Petitioner] testified that he became afraid that he would be arrested after he returned to his vehicle, so he rolled down his window and threw the gun out while he was driving across a bridge. He testified that he tried to call his mother several times on the way home. The [Petitioner] testified that he drove around for a while and bought some Tylenol PM and some vodka. He testified that he started taking the pills because he did not want to live. He testified that he went to his mother's house and took additional pills. He testified that he remembered an ambulance picking him up some time later, but he did not remember going to the hospital.

On cross-examination, the [Petitioner] testified that although he believed that Ms. Scott was his soulmate, he was aware that Ms. Scott was not in love with him. The [Petitioner] denied that Ms. Scott had ever asked him to return the keys to her house. The [Petitioner] testified that he always carried a gun with him for protection, since he had been robbed and kidnapped at gunpoint. He testified that he usually carried this gun on his person, although sometimes it was in his car.

The [Petitioner] admitted that when he went to the victim's apartment complex on June 5, 2008, he was contemplating killing the victim. The [Petitioner] testified that he intended to stab the victim with two different knives and then take his wallet to make it appear that the victim had died during a robbery. The [Petitioner] testified that he had numerous items with him on that day to assist him in executing this plan.

The [Petitioner] acknowledged that he had been friends with "Missy" for a considerable period of time before becoming intimate with her, but he insisted that they only slept together one time. The [Petitioner] conceded that he referred to Missy as "baby" and had told her that he loved her. The [Petitioner] claimed that all of the searches that were performed on his computer concerning "Missy hates" and "Missy dies" were probably performed by Missy herself in an effort to discover song lyrics containing her name.

The [Petitioner] testified that on the day of the shooting, he had no intention of actually confronting the victim. He testified that his intention was to discover the identity of the blonde girl that the victim was seeing on the side and put that girl in touch with Ms. Scott, or vice versa. The [Petitioner] testified that he did not intentionally shoot the victim during

their first struggle and that the only way the gun could have gone off was if the victim had pulled the trigger. The [Petitioner] testified that the victim was incredibly strong during their second struggle in light of the wounds that he had suffered and was "fighting like he was on steroids." The [Petitioner] testified that he shot the victim to make him let go of him and ran away afterward.

Following this testimony, the defense rested, and over the [Petitioner's] objection the State entered into evidence a brief portion of a recording made of a phone call from the victim to the police, in which the victim stated that he was "a little . . . concerned" about the situation that had developed with the [Petitioner]. The State also recalled the victim's mother, who testified in rebuttal that her son was a kind, non-confrontational person.

State v. Brian Le Hurst, No. M2010-01870-CCA-R3-CD, 2012 WL 6673119, at *1-18 (Tenn. Crim. App. Dec. 20, 2012), perm. app. denied (Tenn. May 9, 2013) (footnotes omitted). This court affirmed the Petitioner's conviction and sentence on direct appeal, and our supreme court denied the Petitioner's application for further review. Id. at *1.

On September 1, 2013, the Petitioner filed a timely, pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed motions requesting that the victim's gunshot residue kit and the bullet recovered from the victim at autopsy be submitted to the Tennessee Bureau of Investigation ("TBI") crime lab for testing. Following a hearing, the post-conviction court granted the Petitioner's motions and ordered testing of the items of evidence. The TBI issued an Official Microanalysis Report on the gunshot residue kit from the victim, which stated:

Elements indicative of gunshot residue were inconclusive. These results cannot eliminate the possibility that the individual could have fired, handled or was near a gun when it was fired. However, it should be noted that the test subject has been definitely associated with a firearm discharge, due to the gunshot wound(s).

The TBI's Official Firearms Report on the bullet recovered at autopsy stated that the bullet was a .25 Auto caliber bullet and that the rifling characteristics were common to a variety of .25 Auto caliber firearms, including the "Jennings/Bryco." Thereafter, the Petitioner filed an amended petition for post-conviction relief.

At an evidentiary hearing on the petition, Julie Neilan-Keaton testified that she worked as a crisis counselor at Mental Health Co-op in 2008 and she completed an

- 24 -

assessment of the Petitioner. Ms. Neilan-Keaton explained that she met with the Petitioner in-person when she performed the assessment. Prior to the post-conviction hearing, Ms. Neilan-Keaton reviewed a transcript of her trial testimony, and she agreed that she had been unable to identify the Petitioner at trial. Ms. Neilan-Keaton recalled her phone call to the victim during which she relayed specifics of the threat made by the Petitioner against the victim.

The Petitioner denied that he ever met with Ms. Neilan-Keaton while he was at Mental Health Co-op and claimed that she did not get any information directly from him. The Petitioner testified that about forty-five minutes after leaving Mental Health Co-op, a woman named "Julie or Julia" called for him on Ms. Scott's phone. According to the Petitioner, the woman asked "who Mr. Evans was—or she didn't call him Mr. Evans, she called him Dean." She did not call about an assessment, and the Petitioner denied providing the woman with any information. The Petitioner stated that Ms. Neilan-Keaton's testimony at trial that she evaluated him was inaccurate and any testimony she gave had to be based on hearsay. The Petitioner explained that he told counsel that he had never seen Ms. Neilan-Keaton before trial and that he only spoke to a male doctor at Mental Health Co-op. According to the Petitioner, the male doctor asked him how he was feeling and the Petitioner told the doctor "a lot of the stuff [he] had been going through emotionally[.]" When asked if he expressed to the doctor he was having thoughts of killing the victim, the Petitioner responded:

No, just about my lack of being able to sleep or eat or function. And he—I think if I remember correctly, he asked me if I was going to harm anyone or harm myself, and I told him no.

I was concerned because—and I explained this to him. I was concerned because of the prior—when I had—when [the victim] and I had seen each other at the zoo and just using common sense to say, you know, two grown men, I'm not in a—I'm not in the best—I wasn't dealing well with the stress that was going on in my life at the time and I was just concerned that I wanted to talk to somebody professionally about that.

The Petitioner testified that two attorneys from the public defender's office were appointed to represent him. He explained that, after his preliminary hearing, he had concerns about why no shell casings were found at the crime scene. When he met with counsel, the Petitioner would raise "questions and concerns to them," but counsel "would never have answers to [his] questions." The Petitioner stated that counsel did not review all of the evidence with him before trial. He did not view the photographs of the crime scene or victim's body before trial. The Petitioner recalled that he asked counsel to investigate the crime scene to find out why officers did not find the shell casings. The

Petitioner explained, "Obviously the shell casings were extremely small and there are all sorts of possibilities why they may not have been found—were not found the first time."

The Petitioner stated that counsel went to the property room and viewed the evidence there. Counsel discussed with the Petitioner the autopsy report, which described the trajectory of each of the gun shots. The Petitioner was aware that a bullet had been recovered from the victim's body, and he discussed with co-counsel having the bullet tested. The Petitioner testified that ballistic testing had been done by the TBI in preparation for the post-conviction hearing, and the results of the testing showed that the bullet was a .25-caliber and the report listed a group of manufactured guns that the bullet could have been fired through. The Petitioner stated that this report corroborated his trial testimony that the gun used in the shooting was one that he always carried, and it refuted the State's suggestion that a revolver was used in the crime.

Regarding the forensic search of his computer, the Petitioner testified that counsel provided him with a copy of the report from Mr. Gish, the State's computer expert. The Petitioner stated that, although they discussed the report with him, it was a lengthy summary of data that no one understood. The Petitioner asked trial counsel to contact the Petitioner's brother, Jordan Thompson, who could have testified about the key logger software that was installed on the Petitioner's computer. According to the Petitioner, Mr. Thompson would have testified that the key logger software was installed to monitor Mr. Thompson's internet activity—not to spy on Ms. Scott's activity. However, trial counsel did not interview Mr. Thompson or call him to testify at trial.

The Petitioner claimed that Mr. Wamp's trial testimony was "not truthful" and he had never seen Mr. Wamp prior to trial. The Petitioner stated that, before trial, he assumed that Mr. Wamp was the apartment manager who had confronted the Petitioner on June 4, 2008, based upon the information on the State's witness list. However, when Mr. Wamp stepped into the courtroom, the Petitioner immediately notified counsel that Mr. Wamp was not the man from the apartment complex and that he had never seen Mr. Wamp before. The Petitioner stated that counsel said this was "not important" because they could not prove it. The Petitioner admitted that "in some fashion those events [testified to by Mr. Wamp] did occur." He admitted that he had been at the victim's apartment complex to confront the victim and Ms. Scott because Ms. Scott had been denying any type of romantic relationship with the victim. Additionally, the Petitioner admitted that he told the property manager at the apartment complex that he was there to do contracting work, which was not true. The Petitioner stated that, after trial, he learned that the property manager that he spoke to was Ricky Gully. The Petitioner did not call Mr. Gully as a witness at the post-conviction hearing.

The Petitioner stated that he told trial counsel and co-counsel what type of gun was used in the crime—a .25 caliber semi-automatic Bryco. The Petitioner admitted to counsel that he had thrown the gun out after the shooting but asked counsel how they could corroborate his claims regarding the gun. The Petitioner recalled that he also told counsel that he did not believe a .25 caliber revolver existed and asked them to research this issue. According to the Petitioner, the State offered no proof at trial that he had put a bag on the side of his gun to collect the shell casings. Moreover, at trial, he denied that he picked up the shell casings and that he shopped for a revolver before the murder. The Petitioner recalled that counsel did not object to the prosecutor's argument during closing about the possible use of a bag to catch shell casings.

On cross-examination, the Petitioner stated that he checked himself into Centennial Hospital in early June, after he was kicked off the property where the victim lived. The Petitioner agreed that he checked himself in because he was having homicidal and suicidal thoughts. However, the Petitioner claimed that, when he was sitting in the parking lot of the victim's apartment complex on June 4, 2008, he "did not have a plan or any intent to harm [the victim]." The Petitioner stated that he testified at trial that he did have those thoughts because the State had the Petitioner's mental health records, wherein he admitted to a doctor that he was having thoughts of harming the victim. He had been advised by trial counsel that because the medical records were made available to the State, "it would be better just to go ahead up front and just, you know, tell them about the conversation that had been had with the doctor." The Petitioner stated that, at trial, he should have "explained further" that he merely answered the doctor's hypothetical questions about what "could have gone wrong[.]"

The Petitioner testified that counsel were unprepared for trial. He stated that counsel should have obtained experts to investigate the crime scene and should have searched the crime scene with a metal detector to look for shell casings. The Petitioner told counsel that his gun was a .25 caliber, and the Petitioner did not dispute that the bullet recovered from the victim came from his gun.

As an exhibit, the Petitioner offered into evidence a transcript of the testimony of Special Agent Steve Scott at the hearing on the Petitioner's motion for testing of the gunshot residue kit and bullet. Agent Scott, who worked in the Firearms Identification Unit of the TBI crime lab, testified that, to his knowledge, a .25-caliber revolver did not exist.

Trial counsel testified that he was employed with the Davidson County Public Defender's Office when the office was appointed to represent the Petitioner. Trial counsel was assigned to work the Petitioner's case along with a supervising attorney from the public defender's office. As part of his work on the Petitioner's case, trial counsel

organized the file and compiled lists of witnesses and "investigative issues." Trial counsel testified that he met with the Petitioner "many, many times" and spent a "tremendous" amount of time on the Petitioner's case. Trial counsel stated that, although he took the lead on the case, he worked under the guidance of co-counsel and that final decisions on issues such as the theory of defense were made with co-counsel.

Trial counsel recalled that the defense investigator on the Petitioner's case, Amber Cassidy, obtained the Petitioner's mental health records before trial. At some point, the defense became aware that the State also had access to the Petitioner's mental health files. Trial counsel discussed with the Petitioner the impact the records would have if admitted at trial.

Trial counsel stated that he and co-counsel had "established responsibilities" in regards to the Petitioner's case but he could not recall who was assigned to cross-examine Ms. Neilan-Keaton. Trial counsel made outlines of cross-examination questions for every witness that he was responsible for, and he provided the Petitioner access to those outlines. Trial counsel testified that, if he had become aware during trial that Ms. Neilan-Keaton was lying about her interaction with the Petitioner, trial counsel would have tried to do something about it. Trial counsel testified, however, that he knew of no reason why Ms. Neilan-Keaton might present untruthful testimony against the Petitioner and he would not have had anything to cross-examine Ms. Neilan-Keaton on as to her motive or prejudice against the Petitioner.

Trial counsel recalled that he met with the Petitioner at least fifteen to twenty times and, in the weeks before trial, he met with the Petitioner every day. Trial counsel went over the State's evidence with the Petitioner, and he had "extensive discussions" with the Petitioner about the evidence. Trial counsel expressed his concerns to the Petitioner about the evidence he felt the defense "couldn't overcome."

Regarding the Petitioner's list of potential witnesses, trial counsel stated that he did not specifically recall the Petitioner asking trial counsel to interview those witnesses. Trial counsel noted, however, that he and Ms. Cassidy interviewed the Petitioner's grandmother and mother. Additionally, Ms. Cassidy was included in meetings about the Petitioner's case, and trial counsel instructed her to investigate various aspects of the case. Trial counsel explained, "[W]e had a significant amount of time to try the case, we weren't rushed so we had gotten every interview that was available for us."

Trial counsel recalled that he had discussions with the Petitioner about the computer forensic evidence. Trial counsel described the most troubling information obtained from the forensic search, stating:

We knew that [the Petitioner] had Map-Quested directions to the [the victim's] house on June 22nd, drove to house on the 23rd, shot and killed him and came back and deleted it off of his computer. That was an insurmountable fact that we—how could we overcome that at a trial?

Trial counsel testified that there was also a lot of "collateral background evidence" from the forensic search, such as the Petitioner's internet search for the movie "The Hitman," but trial counsel did not believe this collateral evidence was persuasive to the jury. Likewise, trial counsel did not believe that the jury would care about the key logger program that had been installed on the Petitioner's computer. Trial counsel stated that he did not pursue issues that he thought would be unimportant to the jury. He explained, "[Y]ou have to be careful when you cross examine something that doesn't necessarily matter. It's going to cause the jury to pay more attention to it when they would have necessarily just disregarded it on initial direct. It's a trial strategy decision."

When asked why the defense did not pursue ballistics testing of the bullet recovered from the victim during the autopsy, trial counsel stated that the fact the State had not been able to identify an "exact gun" as the murder weapon gave the defense "some wiggle room[.]" Trial counsel explained that the defense did not want a report showing the bullet from the victim was .25 caliber because the Petitioner had admitted owning a .25 caliber and three other witnesses testified that the Petitioner owned a small-caliber handgun. According to trial counsel, conclusive proof that the Petitioner used a .25 caliber semi-automatic would have bolstered the State's argument that the Petitioner picked up the shell casings. He stated, "I think that the lack of the State being able to confirm whether that happened or not was important to [the Petitioner's] defense." Trial counsel acknowledged that he made no objection to the State's closing argument about the Petitioner's possible use of a revolver.

On cross-examination, trial counsel did not recall that the Petitioner testified at trial that he was carrying his .25 caliber semi-automatic Bryco when he confronted the victim on the morning of the murder. Trial counsel also did not recall the prosecutor's argument during closing that the Petitioner was shopping for a revolver—an argument the State corroborated with the gun shop cards that had been admitted at trial. Trial counsel testified that he did not think the shell casings were important due to the "wealth" of other evidence on the Petitioner's premeditation. Trial counsel agreed that he had known that a bullet had been recovered from the victim during the autopsy and a gunshot residue kit had been performed on the victim. He could not recall if the Petitioner asked to have those items tested.

Trial counsel explained that he had wanted to argue for a conviction on the lesser-included offense of manslaughter, but the Petitioner wanted to pursue a strategy of self-

defense. In his discussions with the Petitioner, the Petitioner indicated that he wanted to testify in his own defense. Trial counsel met "extensively" with the Petitioner before trial to go over the Petitioner's testimony so that the Petitioner was "extremely prepared for his testimony."

Co-counsel testified that he was a team leader in the public defender's office in 2008, when he was assigned to represent the Petitioner. Co-counsel had experience in handling first degree murder cases, and he represented the Petitioner during the preliminary hearing. Co-counsel testified that he was technically the lead attorney on the case because he was trial counsel's supervisor. However, because trial counsel played such a significant role in the case, co-counsel stated they could be called "co-lead[s]" on the case.

Co-counsel testified that he was "very involved" in the case and all decisions on strategy would have been discussed with him. Co-counsel met with the Petitioner "many times" before trial, and he went over discovery with the Petitioner "on multiple occasions." Co-counsel's notes reflected that he went to the property room and photographed evidence. He also met with the medical examiner and then discussed with the Petitioner the things he had learned from the medical examiner. Co-counsel testified that he and trial counsel obtained the Petitioner's mental health and school records, and they hired a mental health expert to consult with the defense. Co-counsel did not provide any of those records to the State.

Co-counsel recalled that the State gave notice it intended to call Ms. Neilan-Keaton with Mental Health Co-op as a witness. When the trial court denied co-counsel's motion in limine to prevent Ms. Neilan-Keaton from testifying, co-counsel prepared to cross-examine her and typed up possible questions for cross-examination. Co-counsel did not remember the Petitioner telling him during trial that the Petitioner had never met Ms. Neilan-Keaton. Co-counsel stated that, if he had thought Ms. Neilan-Keaton was testifying based on hearsay, he would have objected.

According to co-counsel, he and the defense investigator, Ms. Cassidy, interviewed "a lot" of witnesses before trial. They both went to the crime scene and photographed it, and they interviewed a property manager of the apartment complex at the scene. Co-counsel recalled that, when he and Ms. Cassidy went to the apartment complex to attempt to interview Mr. Wamp, they learned that he no longer worked there. Ms. Cassidy tried to locate Mr. Wamp but was unable to do so prior to trial.

Co-counsel testified that the theory of defense at the trial was that, at the time of the shooting, the Petitioner was acting in self-defense. Part of the defense theme was that the Petitioner was "reaching out for help" and "[d]idn't want to hurt anyone." The

Petitioner was getting counseling and moving in a positive direction, so "there was no chance he was going to do anything to hurt anybody." Co-counsel recalled that no shell casings were recovered from the crime scene. Co-counsel stated that he looked for shell casings at the scene multiple times but could not find any. However, he acknowledged that he did not use a metal detector to search for the casings. Co-counsel could not remember specific conversations he had with the Petitioner about the shell casings. He did recall talking to the Petitioner about why the Petitioner had a gun with him on the morning of the shooting, and the Petitioner explained that he carried the gun because he had been the victim of a carjacking previously. Co-counsel did not recall any conversations with the Petitioner about possible ballistics testing. Additionally, co-counsel stated he did not recall the specific arguments made by the State during closing that were complained of in the post-conviction petition.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and later filed a written order denying relief. This timely appeal followed.

## II. Analysis

### *Ineffective Assistance of Counsel*

The Petitioner contends that the post-conviction court erred in denying relief on his claim of ineffective assistance of counsel. He asserts that counsel was ineffective for failing to: (1) complete ballistics testing on the bullet recovered from the victim; (2) object to the prosecutor's closing argument; (3) object to the admission into evidence of a phone call from the victim on the basis of the Confrontation Clause; (4) object to the admission of allegedly irrelevant information from the Petitioner's computer; and (5) object to the testimony of Ms. Neilan-Keaton and Mr. Wamp.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). As such, we review a trial court's findings of fact under a de novo standard with a presumption that those findings are correct unless otherwise proven by a preponderance of the evidence. Id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). The trial court's conclusions of law are reviewed "under a purely de novo standard, with no presumption of correctness . . . ." Id.

When reviewing the trial court's findings of fact, this court does not reweigh the evidence or "substitute [its] own inferences for those drawn by the trial court." Id. at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and

value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." Id. (citing Henley, 960 S.W.2d at 579).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

*A. Failure to Complete Ballistics Testing on Bullet Recovered at Autopsy*

The Petitioner asserts that trial counsel and co-counsel were deficient in failing to perform an investigation into the type and caliber of the bullet recovered from the

victim's autopsy. He contends that the results of the testing would have corroborated the Petitioner's recollection of events, thus bolstering the Petitioner's credibility at trial, and prevented the State from offering "a significant portion of its premeditation and deliberation evidence."

The State responds that the decision not to conduct ballistics testing of the bullet was a strategic decision, pointing to trial counsel's testimony that such evidence "would bolster, not refute the State's argument for the lack of shell casings at the scene." The State reasons that, had the proof from the ballistics testing been presented to the jury, its argument regarding the lack of shell casings at the crime scene—that the Petitioner picked up the casings—would have been strengthened. Finally, the State notes that the ballistics testing "does not refute or mitigate the State's other evidence of premeditation."

Regarding this issue, trial counsel testified that he was concerned that ballistics testing would confirm that the murder weapon was the Petitioner's, and he believed a better strategy was to distance the Petitioner from the murder weapon. Trial counsel also testified that conclusive proof that the Petitioner used a .25 caliber semi-automatic would have bolstered the State's argument that the Petitioner picked up the shell casings. Arguably, counsel should have tested the bullet recovered from the victim's autopsy in order to corroborate the Petitioner's claim that the gun used in the offense was his .25 caliber semi-automatic Bryco and not, as suggested by the State, a newly-purchased revolver. However, it is not entirely clear from the record whether, prior to trial, counsel was aware of or contemplated that the State would argue that the Petitioner used a revolver. In any event, we agree with the State that the Petitioner has failed to establish prejudice in light of the overwhelming evidence of the Petitioner's premeditation, including: (1) the Petitioner made prior declarations to several people of his intent to kill the victim; (2) the Petitioner used a deadly weapon against an unarmed victim; (3) the Petitioner shot the victim multiple times in the head and neck; (4) the Petitioner did not call police or seek help for the victim after the shooting; (5) the Petitioner destroyed evidence of the crime following the murder by tossing the gun over a bridge, getting rid of his bloody shirt, and deleting an internet search on his computer for directions to the victim's home; (6) the Petitioner searching the internet for ways to kill someone; and (7) the Petitioner made prior preparations to conceal his role in the killing by driving his mother's car—rather than his own—to the scene of the shooting and parking it some distance away from the victim's residence. In addition to the overwhelming evidence of premeditation that existed, we note that, although the conclusions of the firearms report would seemingly refute the State's argument that the Petitioner shot the victim with a revolver, they do not refute the reasonable inference argued by the State that the Petitioner picked up the shell casings before fleeing the scene. Because no reasonable probability exists that presenting the proof from the ballistics testing would refute or alter the significant evidence of premeditation and undermine the outcome of this case, the Petitioner has failed to show prejudice and he is not entitled to relief.

### B. Failure to Object to Prosecutor's Closing Argument

The Petitioner contends that counsel rendered deficient performance when counsel failed to object to portions of the State's closing argument, wherein the prosecutor made statements "that were not based on any evidence entered into proof throughout the duration of the trial." Specifically, the Petitioner asserts that counsel should have objected when the prosecutor stated in closing argument that the Petitioner: (1) "looked around for revolvers"; (2) used a bag to catch expelled shell casings; (3) picked up shell casings from the crime scene; (4) brought along extra "construction supplies" as part of his premeditation; (5) chased down the victim; and (6) that it was "possible to know what occurred that day." The Petitioner contends that counsel's alleged deficiency render the jury's verdict unreliable. The State responds that the prosecutor's arguments were, "at a minimum, reasonable inferences based on the evidence" and that the Petitioner cannot show that the failure to object to the complained of passages resulted in prejudice to the defense.

After a thorough review of the record on appeal, as well as the record from the Petitioner's direct appeal, we conclude that the arguments cited by the Petitioner were based upon evidence admitted at trial or reasonable inferences therefrom. As to the prosecutor's claim that the Petitioner "looked around for revolvers," the State offered evidence at trial that the Petitioner browsed several pages of a website called "Gunsofamerica" dealing with Taurus pistol revolvers. Additionally, the Petitioner admitted that he was "searching for guns" and "different ways to purchase guns" leading up to the victim's murder. Regarding the prosecutor's suggestion that the Petitioner used a bag to catch the expelled shell casings or picked up the shell casings after the shooting, these arguments were based upon the lack of shell casings at the crime scene. At trial, the Petitioner testified that he shot the victim with a semi-automatic handgun, but officers testified that they found no shell casings at the crime scene. The prosecutor's comments were thus based on the evidence and reasonable inferences that could be drawn from the evidence. As to the prosecutor's suggestion that the Petitioner may have brought along extra "construction supplies" as part of the Petitioner's premeditation, this comment appears to be based upon the Petitioner's earlier testimony about the "construction equipment" in his car when he went to the victim's apartment (and sat in the parking lot planning to kill the victim) on June 4. The Petitioner testified that he had with him "knives or sharp objects," a change of clothes, "plastic drop cloths," water, soap, a mask, and several pairs of gloves. The Petitioner also admitted that a number of those items were part of the plan to kill the victim that morning. Although the Petitioner's testimony related to items he had with him on June 4, we conclude that the prosecutor's comments were based on proof entered into evidence at trial. Likewise, the prosecutor's argument that the Petitioner chased down the victim was based upon the evidence. Dr. Deering

- 34 -

testified that some of the shots that the victim received came from behind, and various police officers testified that the blood trail that they discovered on the morning in question meandered back and forth—as likely would be created by a wounded individual fleeing from someone with a gun.

Finally, the Petitioner contends that counsel should have objected to the State's assertion that it was possible to know what had occurred on the day of the shooting. In support of his claim, the Petitioner cites to the following statement made by the prosecutor in closing argument:

> Premeditation. The calmness and the coolness. One of two things had to have happened that early morning. And we don't know which it is and we never will know this beyond a reasonable doubt.

While not entirely clear from the Petitioner's brief,[2] we interpret his claim to be that the prosecutor's statement contradicts the State's subsequent assertion that it had proven its case beyond a reasonable doubt. However, having reviewed the entirety of the State's closing argument, we believe that the prosecutor made the above-quoted statement in reference to the State's inability to establish conclusively whether a revolver or semi-automatic was used in the offense. We agree with the post-conviction court's determination that the State never conceded in closing argument that there was reasonable doubt as to the Petitioner's premeditation. The Petitioner has failed to establish deficient performance on the part of counsel in failing to object to these alleged instances of prosecutorial misconduct and is not entitled to relief.

### C. Failure to Object to Victim's Phone Call on Basis of Confrontation Clause

Next, the Petitioner contends that counsel was ineffective in failing to assert the Confrontation Clause as a basis for the inadmissibility of a recording of a phone call from the victim, in which the victim stated he was "concerned" about threats made by the Petitioner. The Petitioner argues that counsel's failure to object on this basis allowed the jury to hear the victim's voice "from the grave."

In denying relief on this claim, the post-conviction court stated:

> The [P]etitioner's post-hearing brief also alleges that trial counsel was ineffective in failing to object to the admission of the phone call played at trial wherein the victim stated that he was "concerned" on the basis of the

---

[2] In his brief, the Petitioner quotes the prosecutor but elaborates no further upon his assertion of prosecutorial misconduct.

Confrontation Clause. The Court held a jury out proffer at the point of the State's rebuttal evidence and only let in a small portion of the victim's phone call. The excerpt was only one statement and less than ten seconds long in its entirety. It would qualify as the declarant's state of mind and would not be excluded under Crawford v. Washington, 541 U.S. 36 (2004). Even if the [P]etitioner raised the objection, it would be admissible as the statement was non-testimonial in nature as no prosecution was contemplated at the time the statement was made. The Court of Criminal Appeals reviewed this issue under a plain error standard and found no error. The Court of Criminal Appeals also noted that playing the recording took up less than ten seconds of a four-day trial and was not particularly emotional, memorable, or dispositive of any major issue in the case. The Court of Criminal Appeals also said that the recording "does not appear likely to have been the decisive factor on which the jury based its decision in light of the voluminous evidence by the prosecution in its case-in-chief." The Petitioner has failed to prove this allegation by clear and convincing evidence and has not demonstrated the requisite prejudice.

Upon review, we agree with the post-conviction court that the Petitioner has failed to establish deficient performance and prejudice. On direct appeal, this court found no plain error based upon the claim that the recording was testimonial evidence and admitted in violation of the Confrontation Clause because "the record before us provides no insight whatsoever with respect to any of these issues." Brian Le Hurst, 2012 WL 6673119, at *25. The same holds true for the Petitioner's claim of ineffective assistance of counsel because the Petitioner appears to be relying on the same record. As noted by the State, "[a]part from the fact that the victim appears to have placed the call on or about June 5, 2008, and that he spoke to a police officer, the record reveals nothing else." Neither trial counsel nor co-counsel was questioned about the circumstances surrounding the call and the creation of the recording at the post-conviction hearing. Furthermore, the record does not provide any context for the victim's statement such as whether it was in response to questioning, the degree of formality, with whom the victim spoke, the scope of any questioning, the victim's purpose in making the statement or the officer's purpose in speaking with the victim. Because the Petitioner has failed to establish that the statements were inadmissible under the Confrontation Clause, we cannot conclude that trial counsel was deficient in failing to object on this basis. Moreover, the Petitioner cannot prove that the outcome of his case would have been different without the recording in light of this court's conclusion on direct appeal that the recording failed to "have any significant impact on the outcome of the trial." Id. As noted by this court previously, the recording is short and "not particularly emotional or memorable." Id. The Petitioner is not entitled to relief.

*D. Failure to Object to Irrelevant Information Found on Petitioner's Computer*

The Petitioner next asserts that counsel was ineffective for failing to object to or file motions to exclude irrelevant computer-related information that the Petitioner argues were admitted with the intent to make the Petitioner appear to be a "dangerous" and "controlling individual." Specifically, the Petitioner references a search for the movie "The Hitman," biblical verses about love, and keystroke software installed on the Petitioner's computer in 2007. The Petitioner contends that the proof was irrelevant because the State failed to establish a connection between this information and the victim's murder.

Regarding this issue, the post-conviction court stated:

The [P]etitioner alleges that trial counsel was ineffective for failing to object to inadmissible testimony by Detective Gish that related to the [P]etitioner's computer and internet search activities. The [P]etitioner testified at trial and acknowledged computer internet searching items that were extremely relevant to the [P]etitioner in this case. The Court finds that there was no error in admitting the evidence the [P]etitioner claims were inadmissible. Nor does the Court find that trial counsel was deficient in this regard. The [P]etitioner has failed to prove this allegation by clear and convincing evidence and has not demonstrated the requite prejudice.

The State asserts that the evidence does not preponderate against the post-conviction court's findings that the Petitioner failed to establish deficient performance or prejudice. We agree with the State.

It is clear from the testimony at the post-conviction hearing that trial counsel did not believe the "collateral background evidence" from the forensic search, such as "The Hitman" movie and biblical verses about love, would be persuasive to the jury. Likewise, trial counsel testified that he did not believe the jury would care about the key logger program that had been installed on the Petitioner's computer and that he decided not to pursue issues that he thought would be unimportant to the jury. Instead, counsel focused on the most troubling information obtained from the forensic search, including that the Petitioner "had Map-Quested directions to the [the victim's] house on June 22nd, drove to [the victim's] house on the 23rd, shot and killed him and came back and deleted it off of his computer." This court will not second-guess a reasonable trial strategy. See Granderson, 197 S.W.3d at 790. Moreover, the State presented other, compelling evidence from the search of the Petitioner's computer which was relevant in establishing the Petitioner's intent and premeditation in killing the victim. Thus, the Petitioner has not shown there is a reasonable probability that the result of the proceeding would have been

different had the challenged evidence been excluded. He is not entitled to relief on this basis.

### E. Failure to Object to the Testimony of Ms. Neilan-Keaton and Mr. Wamp

The Petitioner also asserts that he was denied the effective assistance of counsel when counsel failed to object to the testimony of Ms. Neilan-Keaton and Mr. Wamp on the basis of hearsay. He contends that, although he had never met Ms. Neilan-Keaton or Mr. Wamp, "[b]oth witnesses provided testimony at trial as though they were the individual that engaged in the activity they testified about." The Petitioner argues that, as a result of counsel's failure to object to the testimony of Ms. Neilan-Keaton and Mr. Wamp, he was "denied his opportunity to confront each witness pursuant to the Sixth Amendment."

In denying relief, the post-conviction court accredited the testimony of counsel that they had no reason to believe that Ms. Neilan-Keaton had not evaluated the Petitioner. Regarding Mr. Wamp, the post-conviction court concluded that the Petitioner had not shown that Mr. Wamp's testimony was inaccurate and false, nor shown any resulting prejudice.

The evidence does not preponderate against the post-conviction court's findings. At the post-conviction hearing, trial counsel testified that, had he become aware during trial that Ms. Neilan-Keaton was lying about her interaction with the Petitioner, trial counsel would have done something about it. Likewise, co-counsel stated that, if he had thought Ms. Neilan-Keaton was testifying based on hearsay, he would have objected. Although the Petitioner stated that he learned after trial that the property manager he spoke to was Mr. Gully and not Mr. Wamp, the Petitioner did not call Mr. Gully as a witness at the post-conviction hearing, and we will not speculate as to what Mr. Gully's testimony would have been. See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Additionally, the Petitioner was not denied the opportunity to confront Ms. Neilan-Keaton and Mr. Wamp as counsel cross-examined both witnesses at trial. We conclude that the Petitioner has failed to establish deficient performance on the part of counsel or resulting prejudice. This issue is without merit.

### Prosecutorial Misconduct

The Petitioner also raises a standalone claim of prosecutorial misconduct based upon multiple statements by the prosecutor during closing argument that the Petitioner asserts were not supported by the evidence. The State responds that the Petitioner waived this issue by failing to raise it on direct appeal. We agree with the State.

A ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]" Tenn. Code Ann. § 40-30-106(g) (2014); see, e.g., Jeffery Boyd Trusty v. State, No. M2012-01128-CCA-R3-PC, 2013 WL 5883813, at * 16 (Tenn. Crim. App. Oct. 31, 2013), perm. app. denied (Tenn. Mar. 11, 2014). Because the Petitioner could have raised the issue of prosecutorial misconduct on direct appeal and failed to do so, we conclude that this issue is waived.

### *Cumulative Error*

In the concluding paragraph of his brief, the Petitioner contends that the cumulative effect of counsels' ineffectiveness and the instances of prosecutorial misconduct in closing argument entitles him to post-conviction relief. Given our conclusion that the Petitioner failed to establish that counsel was ineffective and that the Petitioner waived our consideration of his claim of prosecutorial misconduct, cumulative error analysis is not appropriate in this case. We, therefore, reject the Petitioner's claim of cumulative error.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE